In the Matter of A Member of the Bar of the Supreme Court of Delaware: John H. BENGE, Jr.

No. 76, 2001.

Supreme Court of Delaware.

Submitted: Aug. 21, 2001.
Decided: Oct. 9, 2001.

John H. Benge, Jr., Esquire, Centerville, Delaware.

Andrea Rocanelli, Esquire, Mary M. Johnston, Esquire, Office of Disciplinary Counsel, Wilmington, Delaware.

Before HOLLAND, BERGER and STEELE, Justices.

PER CURIAM:

This is the decision in a disciplinary proceeding involving charges of professional misconduct by respondent, John H. Benge, Jr. The Board on Professional Responsibility ("Board") has filed a Report and Recommendation Regarding Sanctions. Neither the Office of Disciplinary Counsel ("ODC") nor Respondent filed any objections to the Report or Recommendation. The Court adopts the Board's findings and concludes that Respondent must be disbarred.

Disciplinary Proceedings
and Board Decision

In May 2000, ODC filed a seventeen count petition to discipline Respondent for alleged violations of the Delaware Lawyers' Rules of Professional Conduct ("Rules"). Respondent filed an answer denying any violations, and the Board con-

ducted a two day hearing in September 2000. The Board then set a schedule for the submission of post-hearing memoranda. ODC submitted its Opening Memorandum in accordance with the Board's revised schedule, but Respondent did not. In February 2001, the Board filed its Report, which found that Respondent violated numerous Rules, and in June 2001, the Board filed its Recommendation Regarding Sanctions, which concluded that Respondent should be disbarred and ordered to pay costs and restitution.

In June 2001, the Court notified the parties of the date on which objections, if any, were due. ODC advised the Court that it would not be filing objections. Respondent requested an extension, which was granted, but he never filed objections.

The Board made the following findings:
*Board Case No. 28, 1999—Josephine Smith Estate*

Josephine Smith died on December 29, 1995 and was survived by her husband, Charles W. Smith. Respondent drafted the Will for Mrs. Smith and was also named as Executor of the Estate. On March 15, 1996, the Last Will and Testament of Mrs. Smith was filed with the Register of Wills and the Register of Wills office issued Letters Testamentary to Respondent. The Smith Estate inventory was to be filed with the Register of Wills on June 15, 1996 and the final accounting was to be filed on March 15, 1997. Neither document was filed by Respondent.

Frances Schanne, Esq. ...[was] contacted by Mr. Charles Smith. At the time [Schanne] was retained, the inventory was approximately two years overdue and the accounting was approximately nine months overdue.... Mr. Schanne testified that Respondent did not respond initially to the efforts by [Schanne's law firm] to contact him. [When he did respond], Respondent then stated that he would be able to "wrap things up in about a month or 30 days." Nothing happened within the next 30 days and Mr. Schanne finally ...[filed] a petition to have Respondent removed as the Executor.... On March 17, 1999, Vice–Chancellor Jacobs granted the motion for default judgment and removed Respondent as Executor of the Smith Estate. On March 25, 1999, the Register of Wills ... wrote to Respondent ordering him to turn over to Charles Smith, the new Executor, any and all unadministered assets of the Estate and to turn over all documents and information regarding the Estate that were in Respondent's possession. Pursuant to [the Register's] order, delivery of these documents was to be made within ten days. Respondent did not comply with the delivery order and as a result, a Motion for Rule to Show Cause was filed by Mr. Schanne. By order dated July 20, 1999, Vice–Chancellor Strine held Respondent in contempt of the judicial and administrative processes of the Court. Respondent turned over the Estate records the night before the scheduled Court of Chancery hearing....

Respondent testified that he had difficulty gathering all of the information to prepare the filings. He also testified that the relocation of his office entered into the delay. He did acknowledge ... that he was not as timely ... as he should have been....

The Panel finds ... that Respondent has violated Rule 3.4(c) which states: "A lawyer shall not knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that valid obligation exists." Respondent maintains that the Register of Wills' order ... is not a court order. Nevertheless, he was held in contempt

... by Vice–Chancellor Strine and no challenge was taken to that order.

The Panel further finds that Respondent violated Rule 8.4(d) which states that: "It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice." Respondent acknowledged that he did not perform his obligations in a timely manner. However, the record demonstrates that there was more than just an occasional excused delay. In fact, once [Mr. Schanne's firm] was in possession of all of the documents, they administered the Estate within a four to five month period.

*Board Case No. 28, 1999—Books and Records Violations*

Mr. Martin Zukoff, CPA testified at the Panel hearing. Delaware lawyers are required to provide a certificate pursuant to Rule 1.15 of the [Rules]. All lawyers are required to certify whether ... they are in compliance with Rule 1.15 on an annual basis. Zukoff performed an audit of Respondent's books and records in May of 1999. Zukoff could not complete the audit because some of the Respondent's records were unavailable. Specifically, with regard to the Estate of Josephine Smith, Zukoff found that no records were maintained of the transactions of the Estate. Respondent ... indicated that he was the executor of the Estate and not the attorney and therefore is not subject to Rule 1.15(d). Zukoff also found that Respondent answered "yes" to a number of items on his 1999 Certificate of Compliance when he should have answered "no." Specifically, questions 5, 6(b), 6(d), and 6(e) were answered affirmatively by Respondent as if he were in compliance when, in fact, he was not.

A further investigatory audit was conducted by Zukoff and he issued a report dated September 27, 1999. In Zukoff's [report], he stated that Respondent was able to locate statements in order for Zukoff to complete his review of the deposits, cancelled checks, etc. In the May 26th visit to the ODC by Zukoff, Respondent represented that he had filed an inventory and Delaware inheritance tax return with the Register of Wills but later concluded when the Register of Wills did not have copies of the documents on record, that he had not, in fact, filed them. Zukoff's letter of September 27, 1999 concludes that Respondent appears to have been in compliance through June, 1999.

On January 27, 2000, Zukoff entered a further report stating that Respondent was now in compliance with Rule 1.15.

Respondent argues that Rule 1.15 does not apply to Estate accounts. However, Zukoff testified that even if we assume that that is correct, he was not in compliance with Rule 1.5 as to his general escrow account. Zukoff testified that Respondent was not maintaining his monthly client balances or reconciliations.

Based upon the testimony and the exhibits presented, the Panel concludes that Respondent violated Rule 1.15(d) by failing to properly maintain the financial records of his law office. With respect to Respondent's argument that pursuant to Rule 1.5 that he was not engaged in an attorney/client relationship and therefore not subject to Rule 1.15, the Panel finds this argument to be disingenuous. Rule 1.15 states that a lawyer: "Shall hold property of clients or third persons that is in the lawyer's possession in connection with the representation separate from the lawyer's own property." The Panel had some concern as to whether, in fact, such a distinction should be made, but the Rules do not create such a distinction. In fact, Zukoff testified that estate escrow accounts are fiduciary accounts and the record

keeping requirements of Rule 1.15 apply. Since Respondent's Certificate of Compliance was not accurate and contained false statements, the Panel concludes that Respondent has violated the [Rules] 8.4(c) and 8.4(d).

The ODC also alleges that Respondent violated Rule 1.5(a) in that Respondent charged an unreasonable fee. Respondent charged $41,000 for his work on the Smith Estate. Based upon the testimony of Francis Schanne who indicated that they had performed the actual work necessary to probate the Estate and charged $20,000, the Panel finds that an Executive Commissioner's fee of $41,000 is unreasonable and in fact, in violation of Rule 1.5(a).

*Board Case No. 28, 1999—Charles William Smith Trust*

Respondent was retained by Charles Smith...and drafted a Trust document. The Trust named Mr. Smith as both Trustor and Trustee and included a provision that required Respondent's written consent to any amendments to the Trust, including Respondent's own . removal as successor trustee. Again, in 1998, Charles Smith retained the law office of Morris, James, Hitchens and Williams to seek...removal of Respondent as successor trustee. Smith and Morris, James attempted to contact Respondent by telephone and by written correspondence.

As a result of those attempts, two meetings were conducted in June of 1998. At the first meeting, Respondent expressed his concern about Smith's request for his removal as successor Trustee. Another meeting was scheduled and Respondent's consent was again sought for his removal as successor trustee. According to Francis Schanne, Esq., Morris James repeatedly attempted to obtain Respondent's written consent by sending him letters. Mr. Schanne testified that Respondent never

responded to telephone calls nor did he consent to the Trust amendment. Again, Morris James was forced to file a petition with the Chancery Court. On February 23, 1999, in excess of one year after Smith first made the request, Respondent consented to the Trust amendment in the Chancery Court's waiting room. As a result, Smith made an application for an award of attorney's fees and costs.

* * *

On July 26, 1999, Vice–Chancellor Jacobs ordered Respondent to pay Smith's attorney's fees and costs in the amount of $4,119.30. On November 5, 1999, Vice–Chancellor Jacobs issued an order and rule to show cause as to why Respondent should not be held in contempt of Court for his failure to pay the attorney's fees and costs....

Pursuant to a prior disciplinary order (*In re the Matter of Benge,* Del.Supr. No. 362, 1996, 1996 WL 539824 (September 18, 1996)(ORDER)), the Delaware Supreme Court approved the report of the Board of Professional Responsibility which required, *inter alia:* "That Respondent shall communicate with each client in writing regarding their pending matters not less frequently than once very three months, and shall respond promptly to reasonable requests for information." By failing to respond to reasonable requests for information by Smith or his attorneys, Respondent violated Rule 7 in that he violated the terms of a prior disciplinary order.

Based upon the evidence presented, the Panel finds that Respondent violated Rule 1.1 ... requiring a lawyer to provide "competent representation to a client. Competent representation requires legal knowledge, skill, and thoroughness in preparation reasonably necessary for the representation." The

Panel finds that Respondent violated Rule 1.2(a) in that Respondent failed to cooperate and abide by Smith's decisions concerning the objectives of the representation. Smith requested through his new counsel that Respondent consent to the replacement of him as successor trustee and only did so after twelve months and on the eve of the Chancery Court proceeding for a scheduling conference. Respondent also violated Rule 1.13 in that he did not act with reasonable diligence and promptness in his representation of Smith. As stated before, it took Respondent over one year before he ultimately consented to his replacement as successor trustee. Respondent violated Rule 1.4(a) in that he failed to promptly comply with reasonable requests for information. Finally, Respondent also violated Rule 8.4(d) in that he engaged in conduct that was prejudicial to the administration of justice. Respondent's actions resulted in a petition in the Chancery Court to order his removal. Respondent should have consented after the initial request was made.

*Board Case No. 46, 1999—Missimer Estate*

Walter C. Missimer died May 15, 1995 and Respondent was named as the Executor of the Estate in the Will that was drafted for Missimer by Respondent. Respondent was appointed Executor on May 31, 1995. The beneficiaries of the Missimer Estate were represented by Thomas J. Eastburn. The inventory and first and final accounting were originally filed by Respondent on June 11, 1998. After a Rule to Show Cause hearing, the beneficiaries in the Missimer Will took exception to the inventory and accounting on September 8, 1998. The beneficiaries complained that the inventory and accounting were incomplete and incorrect. Among the exceptions taken by the beneficiaries were the fact that the inventory and accounting failed to report certain assets, income and expenses of the Estate. On July 20, 1999, Master Glasscock issued a Master's Report after a hearing on a Rule to Show Cause. Respondent did not contest the allegations made by the beneficiaries and in accordance with Master Glasscock "in a candid manner" admitted that an amended inventory and accounting needed to be filed. Respondent asked that he be allowed 30 days to amend the inventory and accounting "upon pain of be removed as Executor". The attorney for the beneficiaries opposed the entry of such an order and asked that the Executor be removed immediately. Notwithstanding this request, Master Glasscock entered an order granting Respondent's request. However, as a result of the beneficiaries having to take this action, the Master recommended that the attorney for the beneficiaries be permitted to submit to the Court and Executor the reasonable costs of presenting the exceptions and that this amount be deducted from Executor's commission.

Mr. Eastburn testified at the hearing that even though the Master gave Respondent 30 days to close the Estate, Respondent took no actions to do so. In fact, there were difficulties over the following year in that he had problems in getting Respondent to cooperate and respond to him. Mr. Eastburn did testify that the administration of this Estate had certain difficulties. The beneficiaries lived in Virginia and there were problems in tracking down insurance policies.

The Panel concludes that with respect to the Missimer Estate, Respondent violated Rule 3.4(c) in that he knowingly disobeyed an obligation pursuant to the Rule of a Tribunal by failing to probate the Missimer Estate in a timely manner

and by failing to cooperate or comply with the Missimer report to file an amended inventory and accounting within 30 days. In conjunction with this, Respondent also violated 8.4(d) in that he engaged in conduct that was prejudicial to the administration of justice.

*Board Case No. 27, 1999—Jones Estate*

Respondent was named as Executor of the Jones Estate in a Will that he had drafted for Russell E. Jones who died on December 30, 1996. Myron Jones was the sole beneficiary. Respondent was appointed as Executor on January 7, 1997. In May, 1998, Myron Jones retained the law firm of Gordon, Fournaris & Mammarella, P.A. as counsel in connection with his beneficiary interest in the Estate. In May, 1998, Russell Jones' residence was sold. Jane Monahan, Esq., a lawyer with Gordon, Fournaris & Mammarella, P.A., testified that Myron Jones was dissatisfied with Respondent's handling of the Estate. According to Monahan, Respondent was uncooperative in efforts to make documents available. There was also a significant tax lien which was a liability of the Jones Estate. Monahan testified that beginning in May, 1999, information was requested from Respondent that might help substantiate a request to compromise the tax lien. Monahan personally took over the file in October, 1998, and began communicating with Respondent in order to get information that they could use to substantiate the compromise of the tax lien. Monahan wrote to Respondent in October, 1998 and followed-up with letters and telephone calls. She did not receive any response until February 15, 1999. At that time, Respondent consented to the release of a personal injury file in which there was some evidence that there had been an equal ownership of the Jones house, thereby lowering the tax liability. It took from October, 1998 to February

of 1999 before Respondent gave his consent to release the file. After the release of the file, Monahan wrote to the Division of Revenue and on April 26, 1999, the Division of Revenue advised Monahan that the tax had been compromised. Monahan wrote to Respondent on May 24, 1999 inquiring as to whether the inheritance tax lien had been paid. The lien was ultimately paid in July, 1999 after Monahan "wrote or called him about six times".

When the house was sold, Respondent paid himself a fee of $15,000 as an Executor's commission. Monahan testified that a reasonable Executor's fee would have been approximately $7,200.00 to $7,400.00. As of October 22, 1999, the Estate had been open for approximately three years and although there had been a draft of an inventory, it is not clear as to whether one was filed. No accounting had been filed. On November 15, 1999, Vice–Chancellor Jacobs ordered Respondent to be discharged from all duties and powers as Executor of the Estate of Jones. Vice–Chancellor Jacobs also ordered Respondent to deliver all unadministered effects, books, papers, proceeds from the sale of Estate assets, to counsel for Petitioner. Respondent never filed an answer to the petition to have him removed as Executor nor did he appear at the hearing. On March 15, 2000, Vice–Chancellor Jacobs entered an order scheduling a hearing on the issue of the Executor's commission being charged by Respondent and the improper payment of any sums by Respondent from the Estate. The Chancery Court also entered judgment against Respondent in favor of Myron Jones in the amount of $2,300 for Petitioner's attorney's fees and costs in connection with two petitions filed earlier. On March 28, 2000, the Chancery Court entered a default judgment against Re-

spondent and ordered Respondent to reimburse the Estate in the amount of $15,500.00. A further hearing was scheduled on May 4, 2000 for Petitioner to be able to present evidence to seek recovery against Respondent for additional sums improperly paid. Finally, on May 4, 2000, judgment was entered against Respondent in connection with the petition for disallowance of the Executor's commission. An additional $497 plus costs and attorney's fees in the amount of $22,625 were assessed against Respondent.

According to Monahan, Respondent did not comply with the court order to deliver all of the books and records of the Estate. A hearing was scheduled on a rule to show cause petition on December 17, 1999 and in the afternoon before the hearing on December 16th between 4:00 p.m. to 4:30 p.m., Respondent delivered what appeared to be the complete file to Monahan.

Once again, the Panel finds that Respondent violated Rule 3.4(c) in that he knowingly disobeyed the Jones removal and delivery order, the Jones attorney's fees order and the Jones reimbursement order. In conjunction, Respondent also violated Rule 8.4(d) in that he engaged in conduct that was prejudicial to the administration of justice.

*Additional Violations*

As stated earlier in this report, the Office of Disciplinary Counsel moved to amend the Petition for Discipline to include allegations of violations of Rules 8.4(b), 8.4(c), 8.4(d) as well as Rules 1.7(b) and 1.9(a).

During the course of Respondent's testimony, Respondent acknowledged that he had prepared the Will for Josephine Smith. After her death, Respondent testified that he advised Charles Smith as beneficiary of potential possible legal challenges to the Will. Respondent acknowledged that he knew that there was a conflict in this regard. Because of the additional evidence and testimony elicited at the hearing, the Panel concludes that Respondent violated Rule 1.7(b) and Rule 1.9(a). Respondent's advice to Charles Smith as to potential legal challenges violated his duties under Rule 1.7(b) since he had prepared the Will of Josephine Smith and was now advising Charles Smith of possible actions to upset the intent of that instrument. Respondent violated Rule 1.9(a) in that he was involved in representation of the same or substantially related matter in which Mr. Smith's interests were materially adverse to the interest of Respondent's former client.

*Conclusion*

For the reasons hereinbefore stated, the Panel finds that the ODC has established by clear and convincing evidence that Respondent has violated the following Delaware Lawyers' Rules of Professional Conduct: Rule 3.4(c), Rule 8.4(d), Rule 1.5(a), Rule 1.15(d), Rule 8.4(c), Rule 1.1, Rule 1.2(a), Rule 1.3, Rule 1.4(a), Rule 7.4, Rule 1.7(b), Rule 1.9(a).

Violations Affirmed

 We review the Board's factual findings to determine whether they are supported by substantial evidence; we review its legal conclusions de novo.[1] After careful consideration, we conclude that there is substantial evidence in the record to support the Board's findings of fact and that the Board correctly determined, based on those facts, that Respondent violated the specified Rules.

1. *In re Higgins*, Del.Supr., 582 A.2d 929, 932 (1990).

## Sanctions

Respondent was admitted to the Bar in 1976 and was not involved in any disciplinary proceedings until 1994. Since that time, however, he has been sanctioned repeatedly for professional misconduct. In 1995, Respondent was given a private admonition and was placed on two years probation for his failure to protect the interests of an elderly client with a personal injury claim. In that matter, Respondent "admitted to violations of Rules 1.1 (lack of competence), 1.3 (lack of diligence), 3.2 (failure to expedite litigation) and 8.1(b) (failure to cooperate... with the disciplinary investigation)."[2] While Respondent was on private probation, his conduct precipitated four additional disciplinary proceedings, which resulted in a public reprimand and two years of public probation. Finally, in July 2000, Respondent was suspended for one year for numerous violations relating to his representation of a creditor in a bankruptcy matter. This Court concluded that suspension was warranted because:

> The most recent ethical violations found by the Board, to which [Respondent] has filed no objections, occurred at a time when [Respondent] was already serving a period of public probation for prior violations of the [Rules]. [Respondent's] record reflects a persistent pattern of client neglect that has continued unabated despite the imposition of a private admonition with a private probation and the subsequent imposition of a public reprimand with a public probation. [Respondent's] disciplinary history demonstrates an inexcusable disregard for his responsibilities to his clients as an officer of this Court.[3]

Respondent's most recent violations continue the same pattern of neglect. He has caused injury to his clients and failed to adhere to previous disciplinary orders. During his suspension, Respondent was ordered to make monthly payments to the Lawyers' Fund for Client Protection, but he failed to do so. Moreover, Respondent has not acknowledged his misconduct, expressed remorse, or offered any mitigating factors for the Court to consider.

■ As this Court has noted repeatedly, "[t]he primary purpose of disciplinary proceedings is to protect the public; to foster public confidence in the Bar; to preserve the integrity of the profession; and to deter other lawyers from similar misconduct. The lawyer discipline system was not designed to be either punitive or penal in nature."[4] The American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards") most relevant in this case are:

> 8.1 Disbarment is generally appropriate when a lawyer: (a) intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system or the profession; or (b) has been suspended for the same or similar misconduct, and intentionally or knowingly engages in further acts of misconduct that cause injury or potential injury to a client, the public, the legal system or the profession.
>
> 4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.
>
> 4.31 Disbarment is generally appropriate when a lawyer, without the informed

---

**2.** *In re Benge,* Del.Supr., 754 A.2d 871, 878–79 (2000).

**3.** *In re Benge,* 754 A.2d at 880 (2000).

**4.** *In re Benge,* 754 A.2d at 879 (Quotations and citations omitted.)

consent of client(s): ... (c) represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.

4.41 Disbarment is generally appropriate when: ... (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

Respondent's misconduct falls in all of these categories, and, consistent with other disciplinary proceedings[5], we conclude that he must be disbarred. This Court Orders that:

1) Respondent be, and hereby is, disbarred. His name shall be immediately stricken from the Roll of Attorneys entitled to practice before the courts of this State;

2) Respondent is required to pay all costs of this disciplinary proceeding upon receipt of ODC's statement of costs;

3) Respondent is required to make restitution to Myron Jones and the Smith Estates in an amount determined by ODC and approved by this Court.

This Opinion shall be disseminated by ODC in accordance with Rule 23 and Rule 14 of the Delaware Lawyers' Rules of Disciplinary Procedure.

5. *In re McCoy,* Del.Supr., 767 A.2d 191 (2001); *In re Rich,* Del.Supr., 559 A.2d 1251 (1989).